In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-2793

REGINALD HART,

*Plaintiff-Appellant*,

*v.*

AMAZON.COM, INC.,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 15 C 1217 — **Rubén Castillo**, *Chief Judge*.

SUBMITTED DECEMBER 21, 2016 — DECIDED JANUARY 6, 2017

Before WOOD, *Chief Judge*, and POSNER and FLAUM, *Circuit Judges*.

POSNER, *Circuit Judge*. A very unusual case, this. The plaintiff, unrepresented by counsel (the district judge had recruited counsel initially, who, however, upon discovering that the suit was groundless, requested and was allowed to withdraw from the case, leaving the plaintiff to proceed pro se), has sued Amazon, claiming that it permitted third parties to advertise on its website six counterfeit copies of books

called *Vagabond Natural* and *Vagabond Spiritual* that the plain-
tiff had written and self-published (that is, published himself
rather than handed to a publisher). According to his com-
plaint he had written and published these books in order "to
raise money and bring an end to vagabondage" by detailing
*his* experiences as a vagabond (a homeless man). After self-
publishing *Vagabond Spiritual*, however, he had decided not
to release it to the public, yet it too had been advertised on
Amazon.

He claims to have been surprised and angered to discov-
er that hard-cover copies of both books were being adver-
tised on Amazon by booksellers to whom he had not (he
says) sent any copies of his books. He says he learned that a
cousin of his had purchased a copy of each of his books ad-
vertised (without his authorization) on Amazon. He has
sued Amazon on a variety of grounds, but all amounting to
alleging a theft of his intellectual property after Amazon re-
fused his repeated requests to remove the advertisements for
the books from Amazon's website (though eventually, re-
lenting, Amazon did remove them). He insists that legiti-
mate sales of his books would have generated "millions of
dollars for Amazon" and allowed him "to end homelessness
[and not only for himself] both in the U.S. and abroad," but
that instead Amazon "forcefully exploited" his books by
counterfeiting them "for its own commercial use."

The eventual removal of Hart's titles from Amazon's list-
ings did not deter him from pressing federal and state claims
in this lawsuit ranging from copyright infringement and aid-
ing and abetting counterfeiting to intentional infliction of
emotional distress. He claims to have examined the copy of
each book purchased by his cousin and determined that all

of them were unauthorized reproductions. He claims to be certain of this because genuine copies (that is, copies that he had produced himself) would bear "indicia of authenticity known only to him"—namely, his fingernail indentations on the covers.

The district judge evaluated Hart's complaint on a motion by Amazon to dismiss and concluded that it fails to state a claim. He reasoned that Hart had failed to make a plausible allegation that Amazon had copied his works (an expensive undertaking) rather than simply provided the platform through which third-party vendors sold authentic, original copies of the books—probably authorized by the author to do so.

There are self-published books advertised on Amazon but also books published by Amazon—the author sends his or her manuscript to Amazon, which publishes it online and advertises it. (An example is a novel by Heather Refetoff called *Quartet: A Novel in Two Parts* (2012).) One might have expected Hart to send his manuscripts to Amazon to publish online, but he didn't; the books bearing his titles that are advertised on Amazon are hard copies only, rather than online copies, and are almost certainly his self-published books because they are identical to those books. Only six copies of the books were sold by Amazon.

There is more that is wrong with his case. There is no plausible allegation that if (a big if) the books sold by Amazon are counterfeits, Amazon was aware of the fact. Amazon provided the platform on which third-party sellers sold the secondhand books and shipped them directly to buyers, but can't be expected to have verified the authenticity of the author or authors of them. His only explanation for calling

them counterfeits is the absence of his fingernail indentations from the books, yet he did not give the court copies of the books on which he had scratched those indentations. Instead he provided the court with photographs of the purported "real" and "fake" books—but the two types of book are in all respects identical. Neither reveals any fingernail marks.

Granted, there is counterfeiting of books (especially textbooks), in which Amazon may be involved to the extent of advertising and selling such books, though without necessarily knowing they're counterfeit. See, e.g., Eliza Green, "The Problem of Fake Books on Amazon," May 9, 2012, http://elizagreenbooks.com/the-problem-of-fake-books-on-amazon/ (visited Dec. 24, 2016, as was the next website cited). But counterfeiting can't be presumed. For example, "all of the apparent copycat books that Fortune found on Amazon were made through CreateSpace, which is a division of Amazon." Mario Aguilar, "Amazon Is Overrun With a Plague of Bestseller Knockoffs," April 16, 2012, http://gizmodo.com/5902283/amazon-is-overrun-with-a-plague-of-fake-books. Hart's obscure self-published titles are a far cry from the pirated bestsellers regularly found on Amazon, and his assertion that the Internet giant must have undertaken the cost of reproducing his hardcover books because they were "not sourced" by him and lack his nail indentations (when neither do his self-published books, if one may judge from the photos) doesn't meet even a minimum standard of plausibility. The judgment of the district court dismissing his suit with prejudice is therefore

AFFIRMED.